IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| OKLAHOMA AMERICAN LEGION CORPORATION, *et al.*, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. CIV-14-356-D<br>) |
| THE AMERICAN LEGION, | )<br>) |
| Defendant. | ) |

# FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Before the Court is Plaintiffs' Motion for Preliminary Injunction [Doc. No. 10]. Plaintiffs seek relief pursuant to Fed. R. Civ. P. 65(a) from actions taken by Defendant to suspend the charter of the corporate plaintiff, take control of its property and assets, relieve the individual plaintiffs of their duties, and assume responsibility for local operations. The Motion is fully briefed and at issue, and was the subject of a hearing held May 21, 2014.

## Background

Plaintiff Oklahoma American Legion Corporation is an Oklahoma corporation and a state chapter of Defendant The American Legion, which is a federally chartered corporation organized pursuant to 36 U.S.C. § 21701 *et seq*. Under Defendant's constitution and by-laws, the corporate plaintiff is chartered as a department known as the Department of Oklahoma (hereafter, the "Department"). Plaintiff George T. Nonamaker is an elected officer, known as the Department Commander. Plaintiff Fredrick L. Speir is an appointed officer, known as the Department Adjutant. In March, 2014, Defendant suspended the Department, removed its elected and appointed officers, and took control of its property and operations. Plaintiffs immediately brought suit in state court

seeking declaratory and injunctive relief from Defendant's actions, as well as compensatory and punitive damages . The claims asserted in Plaintiffs' pleading include breach of contract (violation of contractual due process rights under Defendant's constitution, by-laws, and code), intentional interference with contractual or business relations, and conversion. Petition [Doc. No. 1-3], ¶¶ 15-17. Plaintiffs also claim that Defendant's conduct violated a federal statute. *See id.*, ¶ 11. Defendant timely removed the case to federal court based on jurisdiction under 28 U.S.C. § 1331.

Plaintiffs' Motion seeks a preliminary injunction based on a likelihood of success on two claims: 1) Defendant's alleged violation of 36 U.S.C. § 21704(5); and 2) Defendant's alleged denial to the Department of contractual due process. Plaintiffs ask that the Department "be restored to its property and allowed to operate." *See* Motion at 12. Specifically, Plaintiffs ask the Court to issue an injunction "restoring the status quo and requiring the defendant to remove itself from the property of the [Department]; to return to the [Department] . . . all property which it has confiscated and converted; to suspend any and all orders, resolutions and directives which purport to terminate the employment of Fredrick L. Speir . . . ; to restore George T. Nonamaker and all officers of [the Department] to their respective offices; and to restrain the defendant from interfering with the operations of the [Department] . . . ." *See id.* at 1.

## Findings of Fact

Many facts relevant to the Court's analysis of the Motion are undisputed, including the background facts stated *supra*, and facts regarding the corporate parties and the general state of the Department's affairs prior to its suspension. Additional facts were established by the testimony of witnesses and documentary evidence received during the May 21 hearing. The Court summarizes here only the facts necessary to its decision.

1. Defendant is governed both by federal statutes and by a constitution originally adopted in 1919 that expressly authorizes the suspension of a department's charter after notice and a hearing "for any good and sufficient cause appearing." *See* Pls.' Motion, Ex. 3 [Doc. No. 10-3], Nat'l Const., art. XI, § 1.[1]  Defendant's constitution expressly provides that upon suspension of a department's charter, the national executive committee (NEC) "is authorized, empowered and directed . . . to take possession, custody and control of all of the records, property and assets of and belonging to such Department, and to provide for the government and administration of such Department during said suspension." *Id*. § 4.  Defendant's bylaws direct the NEC to provide "a code of procedure for the revocation, cancellation or suspension of Department charters." *See id*., By-Laws, art. III, § 4.  The NEC adopted such a code in 1940, the provisions of which will be discussed *infra* as pertinent to the Court's decision. *See id*., Uniform Code of Procedure for the Revocation, Cancellation or Suspension of Department Charters (hereafter, "Code of Procedure").

2. Prior to suspension, the Department was controlled by an executive committee (DEC) chaired by a commander, Mr. Nonamaker, who was elected at the annual convention in July, 2013. Day-to-day operations of the Department were managed by an adjutant selected and appointed by the DEC. A prior adjutant, Lance Rooms, was terminated in June, 2013. Following the annual convention, the DEC interviewed applicants and hired Mr. Speir in August, 2013. Mr. Speir's employment was effective September 1, 2013. A past adjutant who was still a DEC member, David Kellerman, was available to assist Mr. Speir in learning the duties of the position.

3. Mr. Speir assumed control of an office run by two long-time employees, a bookkeeper and an administrative assistant. The employees were women related to each other as

---

[1] An additional copy of this exhibit was admitted at the May 21 hearing as Defendant's Exhibit 1. For ease of reference, only the first record citation appears in this Order.

mother and daughter. They were responsible for maintaining membership records and processing financial transactions. The administrative assistant was authorized to sign checks drawn on the Department's bank accounts. Mr. Speir became dissatisfied with the employees' performance, and terminated both women on December 9, 2013. Mr. Speir subsequently learned that the office filing system was unorganized, records were missing, the financial system lacked adequate controls, and the Department had numerous unpaid debts. Suspicious entries in an electronic bookkeeping system led Mr. Speir to believe that embezzlement had occurred. Mr. Speir informed Mr. Nonamaker and consulted legal counsel, and with DEC approval, the Department filed suit against the former employees.

4. In January, 2014, Mr. Speir and other officers received a letter from the National Adjutant dated January 13, 2014, regarding the Department's outstanding invoices. The letter stated that the National Commander had appointed an ad hoc committee to investigate and that the committee would arrive in Oklahoma on February 5, 2014, to review the Department's financial records. The letter included a list of requested records, including audit materials, tax forms, monthly financial statements, bank and investment account statements, and minutes of finance committee meetings. Mr. Speir and Mr. Nonamaker met with the committee members on that date but could produce only one bank statement. Mr. Speir informed the committee that no other records existed, the Department had not conducted a financial audit in the past ten years, and there was no functioning finance committee. The committee informed Messrs. Speir and Nonamaker of the amount of the Department's existing debt to Defendant ($50,000).

5. The members of the ad hoc committee consisted of the National Finance Director (a certified public accountant), the Finance Commission Chairman, and the Georgia Department Adjutant. The committee members reported their findings to the National Adjutant, NEC members,

and other national officers on February 7, 2014, during a telephone conference. Meeting minutes were kept, and a copy of the minutes was admitted into evidence during the May 21 hearing as Defendant's Exhibit 6. The minutes reflect that in addition to financial concerns, the committee reported that the Department's committees and commissions appeared not to be functioning, that there was a lack of oversight in the Department, that Mr. Kellerman remained involved in decision-making even though he was facing criminal charges, that the Department had sued its former employees and they had countersued, and that an urgent situation existed.

6. Mr. Speir and other officers then received a notice from the National Commander dated February 11, 2014, stating that the Department's charter was being considered for revocation, cancellation or suspension at the request of another department, pursuant to Article XI of the National Constitution. A copy of the notice was admitted during the May 21 hearing as Defendant's Exhibit 7. It informed the Department that a trial would occur on March 12, 2014, in Oklahoma City, that the Department would have an opportunity to explain under oath its situation and reasons why its charter should not be suspended or revoked, that the committee conducting the trial would reach a conclusion and make recommendations to the NEC, and that the NEC would make a final decision either to accept or reject the recommendations. The notice also stated: "Should the decision be to suspend and/or revoke the charter, the National Organization will immediately assume control of the operations of the Department of Oklahoma and all its assets." *See* Def.'s Ex. 7.

7. On March 12, 2014, a hearing was convened at the Sheraton Hotel in Oklahoma City by a committee of NEC representatives appointed by the National Commander and chaired by a past national commander, Bill Detweiler. The proceeding was transcribed by a court reporter, and a transcript of the proceeding was admitted into evidence at the Court's May 21 hearing as Defendant's Exhibit 10. The proceeding was attended by representatives of the Department and

5

approximately 50 local members.  At the outset, Mr. Detweiler, who is a lawyer, stated that the purpose of the proceeding was not to conduct a trial, but to gather facts and to make a recommendation to the NEC as to what should be done regarding the Department.

       8.       The hearing committee created a record of documentary evidence that included the January 13 letter and February 11 notice, described *supra*; the ad hoc committee members' notes concerning the February 5 meeting (admitted into evidence during the May 21 hearing as Defendant's Exhibit 18); resolutions from 23 Oklahoma posts requesting that the National Commander investigate and intervene in the Department's financial and administrative management (admitted into evidence during the May 21 hearing as Defendant's Exhibit 15); and copies of invoices and account statements regarding the Department's debts.  The Department presented two documents, consisting of a proposed budget plan and a list of actions taken by Mr. Speir to address problems (which appear in the case record as exhibits to Plaintiffs' Reply Brief [Doc. No. 22]). Mr. Detweiler also announced that the record of the proceeding would remain open for additional materials to be submitted until March 17, 2014.

       9.       During the full-day proceeding, the hearing committee heard the sworn testimony of more than 20 witnesses.  The witnesses and the subjects of their testimony included:  the National Finance Director concerning the Department's outstanding debt to Defendant (then over $64,000) and findings from the February 5 meeting; Mr. Speir concerning the February 5 meeting, the lack of financial and DEC records, his knowledge (or lack thereof) of the Department's debts and past financial and administrative affairs, and his efforts to correct the situation; Jack Dawson, the Department's judge advocate (or legal counsel), concerning efforts to obtain bank records; other current and past officers concerning their knowledge of governance issues; and numerous members

and post officers concerning their experiences and complaints. Many witnesses spoke concerning the influence of the former adjutant, Mr. Kellerman, over the Department's affairs.

10. Mr. Speir testified during the March 12 proceeding, as well as during the Court's May 21 hearing, that the Department had reorganized a finance committee which planned to meet regularly, that he was implementing a proposed budget plan to repay the Department's debts to Defendant and other creditors (although his plan was not an officially-approved budget), that anticipated income could bring the Department current by June 1, that the Department had begun transmitting membership renewals to Defendant on a timely basis, and that an agreement had been reached with the national finance office whereby the Department's portion of membership dues would be retained by the national organization and credited toward the repayment of debts. On the date of the proceeding, a real estate closing occurred on a sale of property worth approximately $50,000.00 that represented significant income to the Department. Mr. Speir testified during the May 21 hearing that his proposed budget reflected an agreement with Defendant, but the terms of the alleged agreement and the authority of any national representative with whom it was made were unclear. During both hearings, Mr. Speir acknowledged the large number of members who had been upset by notices they received from the national office when their membership renewals were not being processed in a timely manner, or were being transmitted without payments of dues.

11. On March 19, 2014, a telephone conference was held for the hearing committee to report its preliminary findings and recommendations to national leaders, including the National Commander, National Adjutant, Finance Commission Chairman, NEC members, and other officers. A copy of the meeting minutes was admitted into evidence during the May 21 hearing as Defendant's Exhibit 11. Mr. Detweiler reported an objection made by the Department's legal counsel at the March 12 hearing regarding the requirements of the Code of Procedure, but he did not

report the actions taken by the Department to reorganize its financial affairs or Mr. Speir's proposed budget plan. The outcome of the committee's report was a decision by the National Commander to convene an emergency NEC meeting in Washington, D.C. on March 23, 2014. Mr. Detweiler testified at the hearing that there was a sense of urgency due to missing funds, concern for members, and damage to the organization's goodwill and reputation, both locally and nationally.

12. The special NEC meeting on March 23 was attended by members in person and via teleconference. The proceeding was transcribed, and the transcript was admitted at the May 21 hearing as Defendant's Exhibit 12. The Finance Commission Chairman made a report regarding the findings of the ad hoc committee that investigated financial matters on February 5, and Mr. Detweiler made a report regarding the findings and recommendations of the hearing committee. Motions were made and approved by all voting members except Oklahoma's representative, to suspend the Department's charter, relieve all officers of their duties until the charter can be reinstated, appoint a reorganization committee with specific authority, allocate funds for reorganization of the Department, secure additional liability insurance, and authorize the National Commander to take any actions and expend any funds that he deems necessary to facilitate an orderly and expedient reorganization.

13. During the May 21 hearing, the Court heard the testimony of Thomas Howell, a member of the Oklahoma War Veterans Commission. The Commission oversees veterans centers and other buildings, including the offices of the Oklahoma Department of Veterans Affairs and other veterans organizations, including the Department. Mr. Howell testified that the Department's office space was reallocated when its officers, including Mr. Kellerman, were not responsive to the Commission's planning efforts. The space could not currently be re-occupied because it is under construction and unuseable.

14. The Court also heard the testimony of Thomas L. Davis, the interim administrator for the Department and a former department adjutant in Maryland. He explained that he originally gained access to the Department's offices with assistance from the Oklahoma Department of Veterans Affairs, and found the files in disarray and found no lists of officers, committee members, or contacts. Mr. Davis discovered that the Department had many unpaid creditors, and he received two IRS levies for unpaid taxes [Defendant's Exhibit 16]. The Department's offices have been temporarily relocated, and he has taken steps to preserve its assets, such as removing past signatories from bank accounts. Mr. Davis has been utilizing only national funds to pay debts and operating expenses, and he has kept an itemized list of expenditures [Defendant's Exhibit 17]. The leadership of the Department's upcoming programs, including Boys State and a baseball program, remains the same, and these programs will go forward as usual with funds from the national organization. An annual meeting is being planned for July 25-27, 2014, with the goals of presenting new bylaws for approval by Oklahoma members and electing new officers. On cross-examination by Plaintiffs' counsel, Mr. Davis stated that he would agree to remain in Oklahoma as a monitor if asked by Defendant, were the Court to order the reinstatement of the Department's charter.

**Standard of Decision**

To prevail on their Motion, Plaintiffs must establish: 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in their favor; and 4) an injunction is in the public interest. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir.), *cert. granted*, 82 U.S.L.W. 3139 (2013). In this federal circuit, courts generally apply a modified standard under which, if a movant establishes that other requirements tip strongly in his

favor, the movant "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003); *see also Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1084-84 (10th Cir. 2004). The modified standard does not apply, however, to certain types of "historically disfavored" preliminary injunctions. *See O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc), *aff'd sub nom.*, 546 U.S. 418 (2006); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Three types of disfavored injunctions are: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *O Centro*, 389 F.3d at 977; *see Schrier v. University of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005).

As stated by the Tenth Circuit: "We characterize an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'" *Schrier*, 427 F3d at 1261 (quoting *O Centro*, 389 F.3d at 979 (internal quotation omitted )). Here, as in *Schrier*, Plaintiffs seek reinstatement to positions held before the alleged wrongful acts occurred. Although Plaintiffs seek restoration of the status quo,[2] their requested relief would affirmatively require Defendant to act in a particular way, and Plaintiffs' reinstatement to their former status would place the Court in a position where it may need to provide

---

[2] "[T]he status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Schrier*, 427 F.3d at 1260 (*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (internal quotation omitted)).

10

supervision. Therefore, the relief sought is mandatory, and constitutes a specifically disfavored injunction.

Because Plaintiffs are seeking a mandatory preliminary injunction, Plaintiffs must satisfy a heavier burden described by the Tenth Circuit as follows:

> [A]ny preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction . . . must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified-likelihood-of-success-on-the-merits standard.

*O'Centro*, 389 F.3d at 975-96.

### A. Irreparable Harm

The Tenth Circuit has emphasized the importance of showing irreparable harm, stating that "a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, [so] the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260-61 (10th Cir. 2004) (internal quotation omitted). "A plaintiff satisfies the irreparable harm requirement by showing 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *Crowe & Dunlevy*, 640 F.3d at 1157 (quoting *RoDa Drilling*, 552 F.3d at 1210); *Greater Yellowstone*, 321 F.3d at 1258. To determine whether the requisite showing has been made, a court must also assess "whether [irreparable] harm is likely to occur before the district court rules on the merits." *See RoDa Drilling*, 552 F.3d at 1210; *Greater Yellowstone*, 321 F.3d at 1260.

11

Plaintiffs argue regarding this factor that the removal of the individual plaintiffs from their positions has damaged their reputations and, as to Mr. Nonamaker, has deprived him of an elective office he achieved through years of service. This argument misapprehends the purpose of preliminary injunctions, which "is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier*, 427 F.3d at 1267. Here, as in *Schrier*, where a university professor sought reinstatement to his academic position, Messrs. Speir and Nonamaker have presented no evidence that their removal from office "during the time it will take to litigate this case will have an irreparable effect in the sense of making it more difficult or impossible for [them] to resume [their positions]" if they prevail. *Id.* The hearing evidence showed that the Department's affairs are currently being carried out by Defendant with a goal of reinstating the Department's charter, and preparations are being made to proceed with the next regularly scheduled annual meeting and elections. If the officers removed by Defendant had identified the problems that led to the suspension of the Department's charter and were in the process of fixing them, as argued by Plaintiffs, then nothing would prevent their reinstatement by the membership through the usual process. Plaintiffs, like the university professor, "made no attempt to apprise this court of any evidence in the record showing actual or significant risk of loss of prestige, . . . reputation or professional opportunities that cannot be remedied by money damages." *Schrier*, 427 F.3d at 1267.

Plaintiffs also argue that the Department is being deprived through Defendant's actions of a right of corporate self-governance and autonomous functioning. This is the crux of Plaintiffs' complaint – that Defendant has overstepped its supervisory role and wrongfully usurped local control of the Department. The Court is aware of cases in which irreparable harm has been found under some circumstances where a corporate shareholder has lost a right to participate in

management or has been prevented from exercising voting rights or maintaining a controlling interest. *See*, *e.g.*, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483, 496-97 (S.D.N.Y. 2005); *Beztak Co. v. Bank One Columbus*, 811 F. Supp. 274, 284 (E.D. Mich. 1992); *Davis v. Rondina*, 741 F. Supp. 1115, 1125 (S.D.N.Y. 1990). In such cases, however, "the issue of whether or not a plaintiff may suffer irreparable harm is highly fact specific." *Beztak*, 811 F. Supp. at 284. A finding of irreparable injury often hinges on an impending business decision or critical event. *See id*. (depriving plaintiffs of a 5% voting block would likely cost them a seat on the board of directors and impair their ability to influence a merger decision).

Here, Plaintiffs have presented insufficient facts or legal authority that would permit a conclusion that irreparable harm is likely to result from Defendant's intervention for the period of time needed to restore order to the Department's business affairs and reinstate its charter. Plaintiffs assume that local control means control by the displaced leaders. However, 23 local posts expressly asked Defendant to take charge of the Department's affairs. Further, the evidence shows that programs of the Department being implemented during the suspension – Boys State and summer baseball – will operate as usual under the control of the same individuals who have historically run those programs.

Under the circumstances presented, the Court finds that Plaintiffs have failed to establish a likelihood of irreparable harm without the requested injunction.

**B.     Likelihood of Success on the Merits**

First, as to Plaintiffs' statutory claim, they allege Defendant's conduct violated 36 U.S.C. § 21704(5), which provides that the American Legion "may provide guidance and leadership to organizations and local chapters . . . , but may not control or otherwise influence the specific activities and conduct of such organizations and local chapters." This claim is based solely on the

13

language of the statute and, if accepted, would invalidate provisions of Defendant's constitution that expressly authorize an exercise of control over a suspended local organization. During oral argument, Plaintiffs' counsel conceded that Defendant may exercise control over a department during a suspension of its charter if Defendant follows the suspension procedures mandated by its constitution and by-laws and, specifically, those set out in the Code of Procedure. Thus, Plaintiffs' likelihood of success hinges on their ability to establish the second claim, that Defendant deprived the Department of a contractual right of due process to which it was entitled under the national constitution, bylaws, and Code of Procedure governing its charter.

The provisions of the national constitution regarding suspension of a department's charter speak only in general terms of a right to "due and proper notice" and to a "hearing and trial" conducted according to rules of procedure to be adopted. *See* Pls.' Motion, Ex. 3 [Doc. No. 10-3], Nat'l Const., art. XI, §§ 2-3. Similarly, the national bylaws merely require the NEC to provide a code of procedure to be followed. *See id.*, By-Laws, art. III, § 4. Plaintiffs' due process claim rests on the Code of Procedure that spells out specific steps. These include: 1) a charge initiated by a department or three posts of the accused department; 2) a resolution by the NEC; 3) a formal complaint; 4) service of the complaint; 5) an answer by the department; 6) appointment of a subcommittee to hear and try the complaint, and make findings of fact and recommendations; 7) a hearing of sworn witnesses and documentary evidence, with a stenographic record made; and 8) a subcommittee's report of the proceedings, with written findings and recommendations, to be considered by the NEC for a final decision. Plaintiffs contend that Defendant skipped several of these steps and insufficiently completed others.

Both parties rely on Oklahoma law regarding voluntary associations, and the principle that an association's bylaws and procedural rules constitute a contract between the association's

members.[3] Plaintiffs concede that courts generally do not interfere with a voluntary association's enforcement of its own rules. As recently stated by the Oklahoma Supreme Court:

> "[C]ourts should not intervene except to ascertain whether association proceedings are conducted pursuant to the rules and laws of the organization, in good faith and lawfully. Absent fraudulent, collusive, unreasonable, arbitrary or capricious behavior, this Court may not overturn a voluntary association's enforcement of its rules."

*Scott v. Oklahoma Secondary Sch. Activities Ass'n*, 313 P.3d 891, 896 (Okla. 2013) (quoting *Morgan v. Oklahoma Secondary Sch. Activities Ass'n*, 207 P.3d 362, 366 (Okla. 2009)). Plaintiffs contend, however, that Defendant acted unlawfully and unreasonably. Plaintiffs also argue that, contrary to Defendant's argument regarding the contract-law doctrine of substantial performance, substantial compliance with the Code of Procedure did not occur.

After careful consideration, the Court finds that Plaintiffs have failed at this stage to make a strong showing that they are likely to prevail on their breach of contract claim. Plaintiffs may establish that Defendant failed to take certain steps enumerated in the Code of Procedure, such as service of a formal complaint and an opportunity to answer. Defendant also may have failed to fully perform some steps in the manner anticipated by the Code of Procedure, which, for example, conferred on the National Judge Advocate the duty to examine witnesses. *See* Code of Procedure, art. VI, § 4. However, assuming the doctrine of substantial compliance applies, as argued by all parties, satisfaction of that doctrine looks to whether Defendant's deviations from the Code of Procedure "'in any real substantial measure . . . frustrates the purpose of the contract.'" *Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Servs.*, 69 F.3d 1081, 1085-86 (10th Cir. 1995) (quoting *Jacob & Youngs, Inc. v. Kent*, 129 N.E. 889, 891 (N.Y. 1921)).

---

[3] Because no conflict of laws is evident, the Court accepts the parties' choice of law regarding their alleged contract.

In this case, the NEC was authorized to suspend the Department's charter for "any good and sufficient cause" after notice and a hearing. *See* Pls.' Motion, Ex. 3 [Doc. No. 10-3], Nat'l Const., art. XI, § 1. The Department's debts to Defendant and the Department's lack of financial and institutional controls were undisputed after the first notice and hearing. Given the Department's admitted failures of management and lack of institutional controls, Defendant's failure to proceed through the formal steps did not frustrate the essential purpose of the Code of Procedure, which was to determine whether there was a good and sufficient cause for suspension. More importantly, in the Court's view, the doctrine of substantial compliance has limited usefulness in the context of a voluntary association. The Court is not persuaded that Plaintiffs are likely to overcome the general rule of judicial noninterference. Defendant is entitled to construe and enforce its own rules in good faith if it "has not acted unreasonably or arbitrarily." *See Brown ex rel. Brown v. Oklahoma Secondary Sch. Activities Ass'n*, 125 P.2d 1219, 1228 (Okla. 2005). The current record does not suggest, in any compelling way, unreasonable or arbitrary conduct by Defendant.[4]

## C. Balance of Interests

The Court also finds that Plaintiffs have failed to make a strong showing that the balance of harms tips in their favor. Any injury to Plaintiffs from allowing Defendant to continue managing the Department's affairs while implementing a plan to reactivate its charter, does not outweigh the real harm that Defendant is likely to suffer from issuance of the requested injunction. Plaintiffs seek to restore a state of affairs so serious that Defendant felt compelled to immediately suspend the

---

[4] Defendant's conduct here is not devoid of the appearance of heavy-handedness. Moreover, much of Defendant's presentation during the preliminary injunction hearing amounted to a weak and circumstantial attempt to call into question the motives and conduct of Mr. Speir during the time he acted as Department Adjutant. However, faced with an urgent situation in which the Oklahoma Department admittedly lacked basic financial operational controls, and administratively was in disarray, it cannot be said that the national organization acted unreasonably, arbitrarily, or hastily in protecting the interest of Oklahoma members and the image of the overall organization.

Department's charter – an action taken only twice in the history of the national organization – and to fund local operations until a reorganization can occur. A lack of financial controls and accountability to local members resulted in 23 posts within the Department asking for Defendant to take action. The potential harm to Defendant's interest in its reputation and goodwill is evident. The Department and Defendant share membership rolls and revenues, and the Department uses Defendant's name and emblem. Plaintiffs, on the other hand, have not shown that a temporary loss of control will cause any tangible, irreparable harm.

Under these circumstances, the Court finds that the balance of hardships between the parties weighs in favor of Defendant, and against Plaintiffs' request for a preliminary injunction that would undo the steps Defendant has taken to restore order and management control.

**D.     Public Interest**

Because Defendant is a federally-chartered, statutory organization with a public mission, the Court finds that the public interest lies in allowing Defendant to pursue its plan of reorganization and reinstatement of the Department's charter. The evidence shows that the financial and management issues that led to the Department's suspension have affected the organization at national, state, and post levels. Local property has been sold to pay outstanding debts without sufficient operational controls in place, and there has been insufficient oversight of Department funds, which jeopardizes the organizational mission. The public interest lies in permitting Defendant to preserve the Department's assets and protect members' interests until appropriate corrective measures can be implemented.

**Conclusion**

In summary, the Court concludes that Plaintiffs have not satisfied their burden to establish that a preliminary injunction should issue to prevent Defendant from taking control of the Department's affairs while restoring its charter and good standing.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Preliminary Injunction [Doc. No. 10] is DENIED.

IT IS SO ORDERED this 3rd day of June, 2014.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE